Page number 25-1091, Affirmed Energy, LLC petitioner v. Federal Energy Regulatory Service. Mr. Weissman, you are the petitioner. Mr. Fitch, you are the respondent. Mr. Sheppard, you are the interviewee. Good morning, Your Honors. May it please the Court. FERC's orders should be vacated, first, because they have impermissible retroactive effect in violation of the filed rape doctrine, and second, because even prospectively, they violate the Administrative Procedure Act. As to the first point, when a firm successfully bid in the capacity auctions for the 2023-24 and the 2024-25 delivery years, it acquired, under the tariff, a vested right to offer the cleared resources in the next three auctions. Because the amendment retroactively eliminates that right, it is contrary to law. All of the parties here agree that a retroactive change in vested rights violates the filed rape doctrine. Second, the contention that barring a firm from exercising its rights to bid previously cleared resources in the capacity auctions to be held in 2025 and 2026 was somehow not retroactive, cannot be reconciled with the Supreme Court's holding in Landgraf that, quote, a new provision that attaches new legal consequences to events completed before its enactment is, by definition, impermissibly retroactive. As to prospective effect, FERC's order is arbitrary and capricious for two reasons. First, the central justification for the amendment is PJM's claim that it had improved its load forecast model in 2016, such that it adequately captured energy-efficient resources on the demand side. As this court has repeatedly explained, FERC was thereby required to, quote, critically review PJM's analysis on that central assertion or perform its own analysis, but FERC didn't either. It didn't review PJM's model, which it has never disclosed, or any comparative analysis of the model. So is it really necessary for them to review the model when, I guess, their position is that giving these or allowing EERs to participate just raised rates for consumers? And so eliminating that lowers the rates and doesn't affect grid reliability. So I think the – I want to break down my answer to Your Honor's question in two parts. There is no question that doing something to eliminate what they called the ADVAC, which they instituted in 2016, would certainly reduce rates. The point of the ADVAC, they had no authority and no reason under the preexisting tariff to put the ADVAC in. We have always opposed this ADVAC mechanism, which did nothing other than raise costs. The second point I want to say is that their analysis that let's leave the ADVAC aside and just deal with the main function, the main rationale for this revised tariff, which is we don't need to have EERs bidding, participating on the supply side anymore because we have a model that already now, since 2016, accurately accounts for all those energy savings. Now, there's two problems with that. Number one, I mean, procedurally, FERC had to evaluate the accuracy of that assertion. And it's particularly important for FERC to actually evaluate that assertion because – Can you answer my question, though? Why did they have to evaluate the accuracy of the assertion if they're just making just and reasonable rates? The rates are more just and reasonable if this unjustified add-on and cost is no longer being passed on to consumers. And the definition of EER says it can't be accounted for on the demand side, and now it is. So it's a very – number one, if all that FERC said is we are going to eliminate the ADVAC because the ADVAC, number one, is not only not provided for in the preexisting tariff, but FERC's 2009 order that was the operation at the time, FERC was specifically asked for, and it's in the administrative record in this case, FERC was specifically asked if you're going to allow EERs, we need to put an ADVAC in like you do in the analogous demand response circumstance. And FERC held in the order. There is no warrant for an ADVAC in this case. That's the ADVAC. The point about – You're saying they could eliminate the ADVAC without eliminating the ability of EERs to participate in the auction. Right. Right. But as to the latter point, which is really where the rubber meets the road here, their ability to eliminate it depends on the accuracy or reliability of their assertion that it is already accounted for because they have this new model in 2016. Now, nowhere does PGM or FERC explain why, since, as Your Honor has pointed out, under L4 of the 2009 tariff, any EER that is already reflected in the peak load forecast prepared for the delivery year in which the EER is proposed doesn't even qualify as an EER. So if they had a new model in 2016, which they've never disclosed or even the results of it, that basically said we're already accounting for what you're proposing to bid, they shouldn't have accepted it. So you didn't know there was a new model until they announced the amendment? So they had been doing this all along secretly? No, no, no. We knew that they – I think at some point they said there was a new model. And it's not in the record, but I think everybody will agree. We have tried over and over and over again to try and engage with PGM and say, okay, you have a better model. Let's sit down and talk about how much of what we are bidding in your model already accounts for. Now, they have their proof in this case in support of this revised tariff consists of two things. One, an affidavit that's submitted by Mr. Gledhill, who is a PGM employee. And two, supposedly, quote, data from the last two years showing they say that it already accounts for it. Now, what – But at what level of granularity do we have to require them to disclose models, review models, et cetera? We couldn't find or I couldn't find any precedent that requires FERC to include the model and let everybody pick apart the model before that it's just unreasonable. We have a very different standard of review that we're applying here. So at what level of granularity do we need to make this requirement? And they're not required to allow you to pick apart their model. No, we're not arguing that we are entitled to pick apart the model. What we have done is to say to them since 2016, if you think you've got a model that already accounts for some or all of what we are bidding in in these capacity options, let's sit down and talk about how we can – because there is a way to determine it – how we can determine it. Now, they have – But you have no obligation to do that. They have no obligation to do it. And the fact of the matter is we made money because they didn't do it, because they put this add-on on which we have opposed from the start. What Mr. Gledhill says is – and it's in paragraph 35 of his declaration – is we don't have the ability, our model doesn't have the ability to evaluate any particular EER program. In other words, we can't evaluate a firm's program. But our model reasonably captures it. Now, this court's opinions, I think, both in Susquehanna and NTE – Susquehanna is a perfect example. The court basically said, well, the SEC had to critically review the analysis that the OCC, the Options Clearing Commission, came up with. And what they did is they said, we have considered it and we find it credible. That's not enough. The OCC said, for example, that its model had been – was the product of consultations with analysts. And this court held in its opinion, who were those analysts? What did those analysts provide? There's something a bit more here, right? They're talking about what the new, I guess, predictions of how energy-efficient products will affect demand, because now there's data from – I forget the name of the government agency that accumulates this type of thing. And to me, it just seems very different when, before, they had a model that didn't account for this demand-side future effects of energy-efficient products at all. And now they have one that does. And they're relying on data from some government agency that tries to predict, like, how this is all going to work. I'm sure it's all very technical. But it seems to be more than what you're talking about in Susquehanna. And I don't know that the level of detail that you think is required is actually required. Well, I'm not suggesting, Your Honor – don't blame me if you misunderstood. I'm not suggesting some granular level of detail. They say we have a model that is based, in part, on data that is collected by EIA. And we have supplemented it by imposing suppositions based on input from independent analysts that we have consulted. Why is that not enough? Well, as to EIA, EIA, the agency itself, acknowledges – and I believe this is in the briefs or referenced in the briefs – first of all, the data that it is using about energy-efficient products and processes is 5 to 12 years old. The agency itself has recognized that it does not track entire categories of energy-efficient products. And it has warned, in straightforward terms, that its calculations, its estimates, are, quote, not to be used as forecasts. So simply saying we have a model that's – if what they said is we're just using their numbers, I think it would be pretty easy to see why simply alleging that without in any way quantifying how much of our resources and the resources of other EERs are being calculated would be insufficient. Now, they say, aha, we have – we're consulting other analysts and, you know, et cetera, et cetera. And that is exactly the situation – I take it that there's something more here because they have this declaration and they used – they identified one body of data that they used. But what this court said, has said repeatedly, is, okay, you modeled, you know, in part based on this, but also based on consultations with analysts and suppositions and hypotheses that you also did. Who were these analysts? What did they say? How accurate did they say your model was? That's the model of what FERC, at a minimum, had to do. Now, they say in this case, well, even if you take all of that as true, we also have evidence because in two of the nine years that we have been operating since 2016, the proof is in the pudding because in those two years, the total amount of actual peak load demand exceeded what we projected as the demand. Therefore, we must be fully incorporating and anticipating energy efficient resources. That is no more true than saying in two of the nine years since we changed something, the Dow 500 – the Dow index has gone up. Therefore, this particular minor stock that is in the Dow index, it's proven that that also went up. There's no question that, you know, this is not an exact science. Their methods are probably not perfect. And what they've said they've done is not going to exactly capture, you know, that the demand increases or decreases based on energy efficient products. Of course. So the question is, how precise do they need to be here? And why isn't it enough to say we had a model that accounted for this zero? Now we have a model that does account for it. We're relying on this data. They specified what it is. It's a government entity, which they acknowledge is not perfect, as you've said. And now we have some proof, not complete proof over nine years, but, you know, we have some evidence that this is working. And so, you know, this – we've accounted for it on the demand side. And I guess the question is, what is – at what level of precision are they required to do this before it becomes arbitrary and depreciate? And they do have some objective data and an objective methodology, which is consulting with the experts, and some objective proof, although none of this is perfect, admittedly. You can poke holes in it all day long. But what level is necessary here? I mean, I'm not – again, I'm not suggesting that there is a particular quantum that they have to establish that's necessary. They have to – the FERC has to independently analyze what they profess to be true, which is that they have captured everything that EER resources, the EER supply. That's what – well, that's what keeps – They have to determine that they've captured everything. They don't. That is what PJM has claimed in its papers. They don't – certainly don't have to prove that because, as Your Honor has pointed out, and we don't dispute at all, it's not an exact science. But what they have to do is FERC has to understand that what's at issue here is not the level of particularity or the quantum of evidence. It's the quality of FERC's obligation to independently analyze an assertion and the assertive support for that. And FERC didn't do that. It basically took Mr. Gledhill's word for it and then said, we have these two gross numbers for what happened in two of the nine years, and therefore we can intuit that this portion of the capacity auctions, which accounts for no more than 5% of peak load forecast, must have been fully accounted for. I don't think you will have any dispute here that they have not yet done the work to determine whether what we or a state utility board or any other EER provider or bidder on the supply side is accounted for or not. It is a fact. But I think you just can see that they don't have to do that at that level of granularity. They don't have to prove everything, but they have to convince FERC that their model, in fact, at least does a reasonable job doing it. And I haven't mentioned the other thing that is, I think, a FERC failing and is sort of incoherent from FERC's orders, which is that FERC's sort of contradictory, confusing treatment of the incentive effects that it itself championed in 2007 and 2009 when it told PJM that it wanted them to allow EERs to participate on the demand side just like electric energy generators do participate on the demand side because allowing them to participate and paying them to participate creates important incentive effects for there to be more and more energy savings in the particular year and in the future. And what FERC says now in its 2024 order is, on the one hand, it acknowledges that providing capacity payments to EERs may increase incentives to invest in energy-efficient resources, but then it turns around and it adopts PJM's contrary assertion that removing these incentives will have no effect on the adoption of energy-efficient products, and then to sort of complete the circle, FERC's order says it doesn't matter. That is not region decision-making, and it certainly does matter both for cost and the reliability of the system. The two years in question are the two most recent years before the order, are they not? That's correct. Now, I will just take one other point if the court will allow me. In FERC's brief, and I believe also in PJM's brief, they say, well, you know, if we analyze about PJM's assertions, you know, maybe it's correct. We don't think it's correct, but even if it is correct, and even if we don't have any coherent treatment of the incentive effects that payments to these energy-efficient resource providers provide to the manufacturers, distributors, and retailers of this project, it doesn't matter because the amendment is just and reasonable because it lowers costs without harming system reliability. That is neither proven nor is it in fact true in both respects. Including energy-efficient resources on the supply side reduces, by definition, projected demand and thus lowers the price unless, to your point, Judge Pan, those resources are already fully accounted for in the peak load forecast. Now, the latter point has certainly not been shown for reasons I've tried to explain, and it is almost certainly wrong. If the EERs are accounted for in whole or in part, then they are already disqualified under the original 2009 tariff, which excludes any EERs that are reflected in PJM's demand forecast. Theoretically. I mean, they've been doing this since 2016. It seems to me it's been sort of a windfall for your clients that they haven't acted on changing the option. Well, it's a windfall for our client if their assertion is correct that they are accurately predicting this. And if they are accurately predicting this, we have no problem with the fact that we are – What do you say accurately? I mean, it just says is it accounted for, doesn't it? It says the definition under L1 of what is an energy-efficient resource is, quote – Reflected in the peak load forecast. Yes. It is not if it is reflected in the peak load forecast. They now say since 2016 we've been doing that. I will be interested to hear what counsel for PJM explains about what on earth they were doing in violation of the tariff for nine years if they really believed that that was the case. I think one thing that's interesting, they – Although that was all to your benefit. It was all to our benefit, but the question is whether what they propose now, which is not only to eliminate the add-back, which was not only not authorized by the tariff but was specifically rejected in the 2009 order, but also to throw us out of the market at all. And in order to do that, they have to show that their forecast is going to accurately project energy-efficient resources. And there's one other point I can just make with respect to these incentive payments. Right now under the system that has existed, even to the extent that they are somehow accurately projecting what the savings will be, those savings reflect the incentives to sell more and more of these products and use more and more of these processes that their payments provide. Once they stop making these payments, there are no further incentives. Well, I guess they say that there are state law programs and other factors that cause consumers to buy these products. It's not just this program that's doing that. And I understand your point is like, well, where's the doubt on that? I don't know what it is to do that. But I guess my question is if we think that this is illegally retroactive, which we haven't talked about, but I do want to talk to her about, what is the remedy for that? Because it seems to me that they can eliminate EERs from participating in their auctions. They just can't eliminate a right that they previously granted that you can, once you clear, you can participate for the next three years. But I guess what is the remedy? Would they have to change their tariff to say, starting three years from now, there will be no more EERs in the market? How would this work? As I understand it, if you accept our argument on retroactivity, but don't accept our argument on the prospective effect of the award, they don't have to change the tariff at all except that this court should order that with respect to the 2025 and 2000, with respect to the capacity auctions held in 2025 and 2026 for future years, the resources that we were allowed to bid in in the two previous years be allowed to bid. And if we clear, we will be paid for. But then does that, you clearing at that point, does that sort of extend your eligibility ad infinitum? No, no, no, no. All that's at issue here is, this is a little complicated, but the auction that was held, the demand capacity auction that was held in July of 2025 and the one that will be held in early 2026, that those resources that were previously accepted and that we convinced PJM that we had adequate measurement and verification both at the time of the bid and at the time of installation, that those particular resources and only those resources be allowed to bid in the next two auctions. That's the only thing that you're asking for in this? In part one, in our argument part one. I think that's the full extent of relief. Now, it's a little complicated. What does that mean though for future auctions? Are you going to be coming back with a new suit that you can participate in next ones if you clear in the 2025 and 2026 auctions? No, no, no, no. I mean, we're not going to be bidding new resources into the 2025, 2026 auctions. It's just the ones that will. Right. These will tail off after two years. Now, when we originally filed this 205 appeal, we asked for a stay pending appeal because we were afraid that this court wouldn't be able to decide before the auction held in July and we wouldn't be able to somehow get the benefit of a favorable ruling. FERC and PJM made clear in papers that our remedy with respect to the auction that has already held would essentially be a damages remedy where we would have to show what our bid would have been, that it would have been above the floor but under the ceiling and what those resources were times whatever the market clearing price is. But then for the one next year, we'll just make a bid and it'll either be accepted or not. I see. Now, on the question of will it be accepted or not, this goes a little bit to the second point. But I think as everybody in this case understands, these EERs as opposed to the people that run electric generation, they are price takers. They are not price makers. At no point has affirmed or to my knowledge any other EER bidder bid the market clearing price. So the notion that our bid wouldn't be accepted is, I mean, it would be very, very hard. You can't decide what your bid is since you're not setting a price as an electricity generator would because they're thinking about their costs, et cetera, but you have none. So are you just trying to predict what the market's going to do? No, no, no. It's a combination of things. First of all, we have the amount of money that we have paid in advance to our program partners, which for purposes of this case is $50 million. So $50 million years before the actual delivery year, we have already paid. We have to deposit, if our bid is accepted or we are accepted as a bidder, we have to deposit hundreds of millions of dollars or at least over a hundred million dollars in cold cash with PJM. We have Goldman Sachs, for example. I'm sorry, why do you have to do that? Because they're all bidders have to post cash collateral to protect against the event that they don't meet their promise. If we don't reduce demand by the amount that we bid that we will, they take our money. Now that's never happened, but with respect to the generators, if when peak low comes and they promised they would deliver, I don't know, 60 megawatts an hour and they only deliver 40, PJM takes the money from their cash collateral that they post. And so in answer to your question, they take the money and buy it at a higher price. And in answer to your question about how do we set our price? First of all, we do an estimate of our costs, not only what we paid in advance and what we are paying our lenders, and also what we have to pay an army of technicians to come up with a measurement and verification plan, both at the time of bid or operating costs, and then make a prediction. Well, make an evaluation about whether, okay, over the three years, over the four years, what at a minimum do we need? Not only to return our investment, but also to continue to provide money that another $50 million the next year to all of these people to incent more. So in what way does the expectation that you'll get to participate for three more years affects your pricing and your business model? Very much so. It's very much so. It's a, how much is it going to cost us? How far in advance? What will we have to pay and, you know, borrowing costs, et cetera, et cetera, assuming that you're going to be able to a hundred percent, a hundred percent. And that's the, because we have a vested right to do so and we are not making a price. That says we have to make this all up in one year and get enough of a return that we can pay the same year money to our program partners to incent further savings. So I hope that that answers your question, but. And when you pay your program partners, do you pay them? Like each year that you're paying them, is it just for the sales of that year? Or like, how does it work for the. So we, we go to them. And what we say is we will buy the environmental attributes. They, they hold the environmental attributes of the efficient products that they sell or distribute or manufacture. We will buy them for the following amount of money. And we will give you this money because the law says the tariff says that it's very important that, that there be enough peak demand. And in order to do that, FERC has said, and PJM has agreed, you have to figure out not only what the actual demand will be absent energy efficiency, but including it. And so that's what we do. They say, all we do is buy sales data and try and make money off it. What we are doing essentially as you know, what they derisively call us as middlemen is we are taking millions of transactions, documenting them, verifying them, bidding them in a standard documented manner. That's backed by real collateral that will be called if we don't deliver. But I guess in this sense, if, if the consumers have bought these products, the savings are going to come on the demand side, whether you bid or not, you're just quantifying what that savings will be. And that was necessary back in the day when first model had no way of accounting for how future demand was going to respond to these purchases. But now the service that you provide, which is quantifying something that previously wasn't quantified is no longer necessary. I guess that's kind of the rub of this whole case. That's the rub of this whole case, which is that PJM says we don't have any way of evaluating their program, but you know, programs of energy efficiency, individual programs, but we have a model that reasonably accounts for all of it. And the question is, is FERC going to take that on their say so and with by genuflecting in the direction of the EIA data and their many analysts, or is it going to do what this court in Susquehanna said, which is you have to ask some questions here. But the ultimate question is they can do that if they want, if they no longer need your services to project demand, they can. And the question is just whether in the interim period you have a vested interest that should be compensated. Oh yes. On the, on the retroactivity point, it doesn't, the retroactivity point doesn't depend on whether. That's an arbitrary and capricious point too. I mean, they can get to where they want to go. You're just saying they can't do it right now in that manner for now. What I'm saying. Ultimately your client's business plan is in trouble. Well, no, I mean, ultimately if they're, I mean, we would be very happy to cooperate with them and help them quantify exactly how much of the resources that we bid are actually in their model. I'm sure you would, but they have no obligation to work with you. They can just say you're out. They certainly don't. But if they say we want to change in our tariff, that all that this whole industry is out. And the reason it's out is because we either fully or reasonably already have a model that reasonably accounts for what you will do to lower peak demand in the out year. If that's correct, a hundred percent, they can do it. And they should do it. And they should have been doing it even under the 2009 tariff. Or since 2016. Yes, exactly. I'm going to take you back quite a ways, just a very specific question. If they claim that, well, we forecast more peak load than there was, which shows that we're already taking account of the ERs. I think you said that if that's not correct, if they're not fully taking account, it would result in rate increases. Is that correct? Yes. That there would have to be price increases as a result of their not having fully taken into account the ERs. If they haven't fully taken it into account and they exclude us, the market clearing price will be higher for two reasons. So in these two years, they didn't exclude you. They didn't exclude us. They did. No, no, they did not. All right. So then looking for whether there were, in fact, price increases in those two years will not help us. Right. Because they had the ad back. Is this in your brief, like now that you're challenging their contention that this lowers prices? Yes. Okay. I believe so. Maybe you can look at it and let us know on rebuttal. Okay. Sure.  Okay. Thank you. Thank you. May it please the court. It's Jared Fish for the Federal Energy Regulatory Commission. The commission here accepted a Federal Power Act section 205 filing from PJM that indisputably until oral argument lowers consumers' rates and maintains grid reliability. Second, that change is not impermissibly retroactive. I'd like to start with the retroactivity point, if I may, and then shift to the just a reasonable point. Mr. Waxman says that affirmed energy had a vested right to offer into three subsequent options after clearing once. Affirmed at no time had a vested right at most. It had a contingent right to offer. And that's for several reasons. First section L 0.1 of the tariff, which predated the tariff amendment provides that an energy efficiency resource may be offered into an option. Only if it's energy reducing benefits are not already accounted for in the load forecast that there there's no accommodation for offering into up to three additional auctions. If you've already cleared once, if the energy reducing benefit is included in the load forecast. So I think L4 though, says an energy efficiency resource that clears an option for delivery year may be offered in options for up to three additional consecutive delivery years. And I guess the definition of energy efficiency resource for purposes of L4 seems to indicate that if you've cleared in the first year, you're an EER for purposes of L4. I feel like you're saying that that can change. You can clear in year one. And if we change our formula, you're no longer an EER because we're accounting for this on the demand side. But I don't know that that's the best reading of this, but that you can change the meaning of energy efficiency resource within L4 within one auction cycle. I don't think that's correct. The energy efficiency resource is defined by section L 0.1. It's not defined anywhere in L 0.4. But in year one, during the auction, the energy efficiency resource cleared the option. Right. And you're saying that in years two, three, and four, it can change. It's no longer an energy efficiency resource. If we then change the formula to account for the demand side. And I don't know that that's the best reading of this, this provision. Well, in order to be an energy efficiency resource under L4, there's, there's nothing in the tariffs that suggests that you don't have to meet the definition of an energy efficiency resource. Right. You've met it in the year one, when you cleared the auction. And you're saying that it can change. It can change. And that makes sense of why L4 is included in the first place. As you pointed out, Judge Pan, originally the three consecutive auction accommodation was there. It would be fine, except for that there's a provision that says you can offer it for an additional three consecutive years. For up to three consecutive years. And if I could just break that apart. So the whole purpose behind L4 in the first place was to account for the four-year lag. So auctions are typically held three years in advance of the actual delivery year. So. I know. Now there's no more, no more, no more lag. Right. Your 2009 tariff, and I'm quoting from your tariff at 6, 2, 5, 6, 0 says energy efficiency resources may be offered into the auctions. And if accepted are entitled to be offered for an additional three consecutive auctions so that the resources may receive capacity payments for up to four consecutive years. And you also said in your 2009 tariff, EE providers should have the ability to obtain the full economic benefits of their investments. Right. So how do you square that with your position now? Well, first of all, the full economic benefits of an investment that's, you know, that's, that's not dependent on being able to offer into three years. There was an argument back in 2009 that, that there should be an unlimited right to offer into future options, but there's an incentive for people to participate in your program, that they, they would know that they would be able to recoup whatever they invest because they would have three or four years. To participate, not necessarily clear, but to participate if they clear. Well, it's not quite your honor. It's an open question whether you need three years to actually recoup an investment. Whatever. It was incentive, but the whole, the whole reason for the three years was to account for the four year lag. And L one is a check on that. And it says if, if we actually improve our load forecast and your energy efficiency benefits are included. And I think you can do that. The question is just what do you have to do for these, these two options that are at issue? I mean, of course you can change that for the future. There's no question, but you said that they're entitled to be offered for an additional three consecutive years in your tariff in 2009. Right. And that's, that's a future legal consequence of the past action. If I could get to my other reason why it's not a vested, right. It's a, it's not a future legal consequence if, when they cleared in whatever the year it was, let's just say whatever. 2000. You said at that point, you can now participate for the next three. That's the past thing that you've granted them. Well, I don't see how that can be squared with this course decision, national cable or mobile relay and national cable. There were contracts for a term of years and there was a vested right in those contracts. Certainly more than here for cable providers to offer exclusive cable service to residential areas. And the federal communications commission came in and said, we've decided that those contracts are anti-competitive. So we're cutting it. Well, it's right. It said, it said it was illegal. And so it's that the government of parties to those contracts, or I don't know, did the government approve those contracts? Not that I'm aware of, but it was still lawfully different. It's not totally different by a firm's own statement, page 35 note three of their opening brief. They say that tariff and contract terms are equivalent for retroactivity purposes and national cable, the contracts. There is different though. I mean, of course, people who enter private parties who enter a contract and then the law changes, that's going to affect their contract. But here we have a tariff that was approved by FERC and there, and we have. The 2009 tariff, which said that they're entitled to participate for the next three years, which was approved by FERC. And now you're changing your position. I don't see how that's not retroactive, but your honor, I know of no case. This court doesn't have one to my knowledge or, or a Supreme court case that says there's a difference between a vested right. That's set forth in a contract and a vested rights that set forth in another document that that's approved by commission. Turn on that. It turns on what was actually granted invested. And you have a tariff that says you're entitled to participate for the next three years going forward. And so they, at that point were entitled at the time point that they cleared to participate for the next three years. And now you're changing that. And I don't see why that's not retroactive. It's not retroactive your honor, because a, we're not changing invested.  And so I'll put aside the L L one point for a moment. As this land. If your 2009 tariff said that they're entitled to it, once they clear. Because the question for retroactivity purpose. So yes, we did say you're, you're entitled to up to three subsequent options, but well, we said you may offer. I'm actually saying titles, but that's well, to the extent that there's, there's a difference between what we have, how we have interpreted L one now and how we interpreted it back in 2009. That's a question of law for this court to decide in the first instance, what it means. And L one says you may offer into up to three consecutive options. And that up to language is accommodates the, the provision L one that provides a check in case these, these titles to ask you. Well, I don't think L one doesn't actually say, or L four doesn't actually say entitled. It says, but I think your 2009 tariff did.  the two it's the 2009 order and the, the order didn't even discuss L L one or how that's check. It was just discussing in general terms that to account for the four year lag, these resources would be allowed to offer him. But if I could get to my other reason why it's not a vested right under land graph, which is the, the prime case for, for petitioners, they say the test is for retroactivity, whether a legal change alters rights, a party possessed when he acted. And it makes sense to tie the right, possessed the vested right to the action of that party, because retroactivity is concerned with reliance interests. Did you act in reliance on, on a particular vested right? Well, every time that affirmed acted, it had only a contingent, right? When it purchased $50 million worth of energy efficiency, resource data, it had reliance when they price their bid. They're pricing in the idea or the concept that if we clear, we're going to get to participate in three more of these. So why isn't that reliance? Well, if they clear it, so that's a contingent, right? That might be a secondary, right? All businesses like make plans based on contingencies. Right. And so anybody who's making a bid, even the power plant companies are making. That's based on contingencies. And so they decide this is going to be our bed and our business model. We're going to invest this much in getting lows to like, sell energy efficient products. And we're going to, you know, project like how much that's going to save. And, and if we clear, we'll get to recoup additional money because we'll get to participate and we'll try to price to clear. I mean, I just think that's something that they would include in their modeling and deciding what they're going to price. I think Mr. Waxman just confirmed that. So why isn't that reliance? Exactly. And, and those are the types of, no, no, no, not at all. Let me, let me explain. There's a reliance interest in there, but that's not, but it still has to be tied to a vested right to fall under primary retroactivity. Let me explain why, if I may. But if I can just so that you can explain, I think their position is. We can rely on the fact that if we clear, we're going to get to participate in the next three and we're going to put that into our bid. We're relying on that because we're entitled to do so in the next three options. Not quite, not quite.  yes, they, they had that reliance interest, which we accounted for in our orders. But this, we weighed the benefits of excluding energy efficiency resources from the auction.  and then we're going to the secondary.  but this is what we're on the retroactive.  Sure. But, but to clarify, this court is very clear in national cable in mobile relay in cell tronics. That's the, that's the question of measuring reliance interest. Yes, businesses make economic decisions based on what they think the law will be. But that's a secondary retroactivity question that, and once you have a contingent, right, secondary one, but they also have the argument. This is a primary retroactivity problem, right? But they need to get over the fact in land graph that for primary retroactivity, you have to show that a legal change alters the vested, right? The party possessed one, he acted. And when they acted, they did not have a vested right. They had a contingent, right? When they purchased that, you're answering the question because I, their position is that when they did, they factored in that. They were entitled, entitled to participate in the next three options. If they clear, if they cleared, that's the contingency. So yes, they had an expectation. If they cleared, if another actor, if another circumstance change,  that's if, if it bright, but for purposes of primary retroactivity, that is, it is critical. They did not have a vested right when they offered into the auction to, to offer to three more that right. Only vested if invested at all, if they, if PJ, I'm running the auction, if all the other participants bid something higher, they did not clear. So when they did clear, did they get invested, right? They did clear. And your Tara said, you're entitled to spend the next three. They clear. Is it now vested and entitled?  I would say it's not because of the operation of, of L 0.1, because they never had, they never had an absolute right to offer into three subsequent options that the energy efficiency benefits. Or, but again, it would though, if you define energy efficiency resource at within L four, as when you bid, you're an energy efficiency resource, you clear an option and you can be offered for three additional consecutive delivery years. If you interpret L four to say that the meaning of energy efficiency resource, a particular resource doesn't change within L four. When you clear the first year, you're, you're allowed to participate in options for three additional consecutive delivery years. And since you were an energy efficiency resource, when you cleared, that doesn't change for that particular resource. Right. That's the way it seems. I understand. Makes sense to interpret L four. I understand just Pam, but that's simply not consistent with land graphs test that looks at what right invested. You're switching. I'm trying to just look at the definition of L four and the best way to interpret it. So let's put land graph aside for a minute. Why isn't that the best way to interpret L four? Because the best way to enter again, L four was there to account for the four year lag. So if the four year lag doesn't exist, L four doesn't make any sense. And that's why the future, but I think that doesn't make L four nonsensical. If you say Ford, if you cleared, you can be offered for an additional three consecutive delivery years. You are still an energy efficiency resource for that period. And then you can of course change it. So in the future, we won't do this anymore, but for the people who cleared, why do that? Why do they not have an entitlement? I don't think that that works for well, three reasons, your honor. First, the phrase up to has to be doing some work in L point four. We could have just said an energy efficiency resource that clears an option for delivery year may be offered in auctions for three consecutive additional. It makes sense. If it says they could choose not to participate.  but it's, it's, well, I don't know. Well, first of all, I don't know why they would never participate. They've already paid for those products, but they could choose not to participate for one of the, the next three years. That's what up to means. It doesn't mean up to a superfluous or nonsensical. Well, I think, you know, they, they use the example of, of a bedtime where, or, sorry, of, of watching kids, watching TV and parents, as you may watch TV for up to three hours, if you finish your cleaning tours. Well, what if there's another provision that says, okay, but you can't watch any TV after dinner and dinner happens to fall. Three hours after dinner, but I'd rather play my video game. So I'm just going to watch two hours of TV and play my video game for an hour. I mean, it's like,  we, we can participate for the next three, but this year we choose not to for whatever reason. I don't know what that's about. Well, they could read it that way, but at the very least, I'll force, I'll force. The point is, if they can read it that way, your argument that up to makes no sense.  it doesn't work. I think it would be, it'd be harder, but could I just add the third reason? Why does their argument doesn't work? It would totally undermine our ability to enforce the federal power act. We provide an example. It's very possible that PJM had filed a section 205 tariff amendment with us back in 2009 that said, if your energy efficiency resource clears one auction, then you may offer into future auctions. And PJM thought that was perfectly rational. I don't see why that that's at all relevant here. Because well, because the principle is the same that you're articulating judgment. If we had, if you can just change your tariff beyond these three years, your point is,  you can lock us into never changing our tariffs ever, but that's not true. You just have a provision that says, if you clear, you get to participate for three additional up to three additional consecutive delivery years. But you can PJM clearly could change this tariff to say, after those three years, we're not doing this anymore. E. R's are out. No more options with E. R's. That's fine. It's just that this vested interest has to be honored and you can go ahead and change your tariff. Otherwise, right. That could be the circumstance here. But if this court writes an opinion that says there, it is retroactive to take away a future, right? That that's a tariff originally says.  if the tariff did say, if you clear one option, you may offer into future options. That's not totally out of out of left field.  then there would be no ability. There's no end date to that. There would be no ability for us to come in, or PJM to come in and say, we find that's not just unreasonable anymore. We need to change it. And they're simply their only response is,  FERC wouldn't approve that tariff in the first place because it can't be just reasonable. Yeah, giving people vested rights that you don't want to follow through on. But that's crazy about that. That's not how section 205 works. Section 205. No, but for purposes of the Federal Power Act, no, I'm saying, for purposes of Federal Power Act, what Congress intended, that can't be right. It's not, it's not consistent with ensuring just and reasonable rates. A utility can file a new rate and that goes into automatic effect after 60 days, absent our rejection of it. And that happens quite frequently. I just argued a case a couple of years ago on a giant PJM rule, setting prices for entities to offer into the auction was heavily litigated. That went into effect by operation of law without any commission determination. And so if a utility could come in, file a tariff that says, if you clear once you get to offer into future auctions, and maybe we're deadlocked two to two on it. Maybe we just don't take any action on it. That tariff goes into effect. And under a firm's theory, that could never be undone. That can't be a consistent interpretation of retroactivity law. That's consistent with our obligations under the Federal Power Act. It would also prevent us from coming in under section 206, where we have an obligation and duty to remedy unjust or unreasonable rates. We couldn't come in then and say, we find this rate is all self-evident. I think it's a straw man though, because that's just not what's before us. And that's not necessarily the implication of what's before us, because I think that's why there are careful things, such as the definition of energy efficiency resource to make sure to say that that's an account if we're already taking it into account in the future. But regardless, I think the commission has to be careful about what it's approving to make sure it's not giving people vested rights and things that they don't want to honor in the future. That's all it is. This case is a perfect example of how that doesn't always work out. Something that's just and reasonable in day one, here before energy efficiency resources were considered low forecast, might be unjust or unreasonable in year 10. In fact, I think based on your position and PGM position, the rates have not been just unreasonable since 2016. I'm really wondering why it took them this long to figure out that this is costing consumers so much more money. Well, I think that's partly a question for PGM's counsel, but also answer it first. And it goes to the point that it's not like this is a small impact. If affirmed is allowed to offer into more, more auctions, electricity rates have been surging. Capacity prices increased from approximately $2 billion to over $17 billion. And I believe this is the 2024-25 auction alone. An auction in which energy efficiency resources received over $120 million in revenue. Prices are still. Affirms though, because they're the only ones before us now. You wouldn't have to let everybody participate only that. Like how much money are we talking about? Well, that's, that's not in the record. And I think it's, it's telling, you know, firm says that they project to earn 90 million to $178 million. I believe from the 2025-26 option alone for their one fraction of the ERs though, because they're not all the ERs. No, that's what they said. They expected to. I know, but I'm just saying that in terms of overall utility rates, they're just one. Right. So that's doing this. We're not talking about all of them and we're only talking about two options. And it's only the ones that they previously did. They can't bid anyone. We're talking about two options. We're also talking about hundreds of millions of dollars being transferred from consumers to entities like. Not to this extent. Well, yes. Well, I can't speak precisely to that, but I can, I can say. Energy rises have been spiking and that cause that was part of the impetus for the independent market monitor to file a complaint, arguing that what PJM had been doing was unlawful. The independent market monitor dismissed that complaint in November 2024 because PJM made this filing to say, okay, we're going to correct this now. But if I could shift to the just and reasonable point, Judge Pan, unless there are other questions or retroactivity. So I think you hit the nail on the head. There is no question here. And there's certainly no dispute until Mr. Mr. Waxman presented his argument today that the tariff amendment saves consumers money and maintains grid reliability. And that makes perfect sense because of the way that PJM has operating with been operating with the ad back since, since 2016, even if, even if PJM were underestimating energy efficiency resource, energy efficiency benefits in the load forecast, there still would will no longer be a transfer of payments, a surplus transfer of payments from consumers to entities like a firm. I think there's no question that you can do this. Like this is this, this change can happen. The question is just what to do about the retroactive, what apparently retroactive to me grants of this right to participate in the next couple, it's a transitional thing just for the, for I guess it's two options that are at issue. I just, just kind of, if, if this court were to write an opinion that says, okay, the tariff says you cleared in year one. It's a very sound thing. It's this particular tariff says that if you clear in this year, you get to participate in these next three years in this particular factual circumstance, that's invested interest that this particular tariff gave to them. I don't think that that ruins your entire regulatory framework. Well, I, I think it very well could, because if a tariff, it's not, it's I respectfully, I disagree. If a utility came in and said, you may offer into future auctions. If you clear once that's not out of left field, then don't approve that tariff. If we're deadlocked to two and we can't, we can't rule on it. It goes into effect where we're in hypothetical land now. I mean, it's an opinion that is very fast bound. And so this particular pair of does this tariff is this particular thing that gives them a right to participate in two auctions is not going to bring down your regulatory framework. I think it very well could. I think if, if it's the way Congress set up the federal power act was to ensure that we have on a going forward basis, the ability to remedy unjust or unreasonable rates. And if utility makes a filing and says in year one, we think we, maybe they haven't even really thought hard about it. We're going to give this right to a particular market participant because it seems like a really good idea now. And we're not going to put an end date on it because we can't imagine that it would ever be unjust or unreasonable or that prices would spike or that this would give them a windfall. And the commission doesn't rule on it, which happens or deadlocks two to two, which happens under that theory of the case, we would never be able to change that. But that are wrong or bad that you're not ruling on them, not just the. But we have the ability to come in and say that is unjust or unreasonable. So on a going forward basis, you can no longer apply it. And under that logic, You just have to litigate that. So that's not the case that's before us. Well, or a utility wouldn't be able to come in and say we change our tariff under their theory. We're not deciding that now. Well, respectfully, I think the court will be deciding that. If it rules that on a going forward basis, taking away something that was provided constitutes eliminating investor. Right. And I would just end by saying that we should have a ruling that says you can take away something that was decided as a vested right. Then we're not following our precedents on that graph. So I think this court is in national cable and mobile relay, but they dealt with future. They distinguished future legal consequences of past actions from past legal consequences. That's what I keep telling you. It's a very specific tariff. I think I understand. Anything else? No, no. Okay. Thank you. Thank you. We're in Japan. Please report. My name is John Shepherd. I'm representing the system operator here in their connection. And I think that there's been a lot of discussion about retroactivity. I'd like to retread it. You're trying to in your last series of questions, focus on the exact language of all forms and in a very low for bright, appropriate way, looking at the text and saying, what does this mean? And you've also asked some questions about why it was that this wasn't changed for a long period of time. So I like to focus on both those systems because they're closely related. When the order was written in 2009 and your honor was referring to the tariff. I think your honor was referring to the order where it used the phrase entitled, which is not a great word. And and sometimes we can find if we're looking for a trade picking items like that can can find such things in the tariffs. I think that much of this case is built around reaches like that. Put us back in the in the timeframe of 2009 when energy efficiency is first coming in the fight that we were having and nothing to do with that one. The question was, are we ever going to have a mechanism that's going to allow us to be able to recover this money? And the answer was to put an L4 and say, well, you are going to be allowed to participate in these future auctions. But the background rule was always L1. If you're reflected in load forecast, you're not an energy efficiency resource. You can't participate at all. So. The L4 was written in the context of a time when no one was expecting there to be a load forecast that was going to capture what they were going to do. And so they needed a mechanism to be able to participate. It was a forward looking thing at a time when no one could forecast the change going to be. That is, I think, the appropriate way for you to read L4 only as a background rule for L1. It's interesting that they're taking such an aggressive position to me. It's at least true to me that they're taking this aggressive position, what this means, because we just begin with the word may. May is not the language of the command. It is. It is clearly meant to be permissive and both in their, their, their, their request for. Allowed by PGM to participate in the auction. Except for it's immediately followed by two situations where that may not be the case. And then says, but if your equipment's worn out and it's past, it's life date, then you can't be here. Also, if you want to lock in your, your, your prices and participation, you can do that to the new entry price of judgment. The reason why I'm mentioning that is because they were so concerned about the fact that the word may is not imperative that they came up with this theory that may must mean shall, because otherwise it would be superfluous for FERC to, to, to say that capacity clearance is not guaranteed. That's another big difference between now and then. Mr. Waxman spoke a great deal about the fact that they're price takers. They're just going to take whatever the market will bear. Of course they will, because their investments for buying receipts from people are never going to equal the amount of investment you have to do to drop millions of dollars of iron in the ground and buy fuel in order to run thermal things. So of course they're going to be very price takers. And they are in fact a very small part of the market, which is one of the reasons when modeling them is always going to present certain difficulties because you're measuring the millimeter differences, the length of hair in the back of someone's neck and wondering how that affects their body weight. That's a bit of a stretch, but I think you get the basic point. This thing is not the big, the big part of the market. They are such a small part of the market. What Mr. Fish was saying about these are millions of dollars is going to affect. That's, that's, that's what I know. This is, this is the problem. Problems are being paid a very great deal of money to provide a very, very small service. That is the problem. When I say that they're a small part of the market, I'm going to talk about the money they're extracting from it. I'm talking about their contributions to reliability. I totally agree, which is why I don't know why. So what's the mystery? The mystery is like, what happened? I traced this back to a particular date. FERC issued an order called Advanced Energy Economy in 2017 after the first Trump election. They were, they were, they were coming in. I was on plenty of time going to FERC and did, did later. And it was alarming to read this order because you have a very strong signal. Hey, I can give you the site if you, if you want. It's 2017 or saying, no, we're not going to let states opt out of providing the site is one moment. It is one 61 FERC paragraph number six, one, two, four,  And you can look to page seven. The, the, the, the question in that case was, are we going to let states opt out of EE? Because we did let them opt out of DR, which became a whole issue. We had the FERC residential litigation here and then went to the Supreme Court. So that was a very powerful signal. EE is important. And then we got other orders like order 2022, the whole regulatory impetus during that phase of, of, of FERC regulation was aimed at kind of drilling down and finding any sort of creative way they could to get prices to be lower and lower and  They got too low. And, and people left the market as our brief traces of the history. Why, why did, why did, why did, why did the attention suddenly turned to EE in the same way that turned to other things that had gotten this sort of free pass. There's a, there've been a lot of litigation about something called the minimum offer price rule, not before you, but generally in the third circuit, but it involves how you, how you deal with subsidies and so forth. And there was a sort of theme built in from 2014 and the NGVP order that well, some things were just too small. And there'd been a market that's big to worry about. So in 2014, we've got, you know, third circuit decisions and FERC orders thing. We don't really care about renewables. They're such a small part of the art. So it's all probably passing market. They don't have tests. They don't have to have specially like restrictive rules. Same thing for DR, same thing for EE. But then EE begins to climb, climb, climb, climb, climb. What are the two things that really begin to shock the conscience? This thing called winter storm Elliot occurred right before Christmas in 2022 that led to a year long multi, this is hundreds of parties involved. And we ultimately had a settlement of 180, 180 parties. When we realized we are suddenly paying DR and EE this huge amount of money because they don't have a performance obligation to do anything. And so there were, in fact, you were talking about, there used to be a number of, VRM is not the only EE provider. That's because these other guys got more money than they ever thought they were going to get. And they just disappeared before we could even get to a settlement. So there was significant worry about what was going to happen with EE entities that were able to receive bonus payments when they were utterly unable to provide any actual good to the system at the time. So it began a very long stakeholder process. They were like, look, who is going to go to the emperor and tell him he's wearing no clothes? Because FERC keeps saying that EE is this awesome thing and it's going to be, it's a wonderful thing for consumers. And we had to bite the bullet and say, no, this is actually a terrible thing. And so we started a stakeholder process, lasts for a year. The stakeholder process shakes loose even more fruit because what we're not talking about are some cases FERC still has before them. Three complaints by the IMM, all of which are now pushing an argument they apparently agree with now, which is that somehow this is all illegal because it was in the ADVAC mechanisms created in Manual 18 and was not put in the tariff. And there's a whole rule of reason line of cases about how those things work. I'm very, very surprised to hear them say that they've always been against the ADVAC because they would not receive money otherwise for many, many, many years. And I'm not entirely sure it's accurate, although I'm sure they probably believe it, but it's not consistent with my memory or the history of my life that that's the position they've been taking. But I'd be delighted to be educated otherwise. So we have a shock to the conscience situation. The IMM files last June, and he says, you know what, this has always been illegal. We want to take back all money all the way back to 2016. That's an example of retroactivity. He files another complaint and bifurcates the guys who work for state utilities and the ones that don't. Then he files a third complaint. He filed yet another complaint, and this is when in our brief we pointed out that actually the firm had conceded in response to the most recent complaint by the IMM that this is all a forward-looking thing, not a retroactive thing, because they were trying to say, look, what he's doing now is violating what FERC said it was giving us our protection, which is that it was only going to be prospective. So we're dancing around all these terms, but this is just clearly not retroactive. And if, in fact, we were to lose this position here, this is why I say this, because Congress, Your Honor, Congress knows how to tell us what does and does not constitute necessary relief. And this ties into both the retroactivity argument and also the reliance argument. What does Congress say? If you have 60 days under 205 to get this filed and FERC does nothing, it goes into effect. That case you were talking about before is actually living against him. In the Third Circuit, the case where we're dealing with the tie-tie vote and what's going to happen with a much larger amount of money under the MOPR, Congress told us 60 days is enough notice, and that is all that the world needs to be provided. I think Your Honor was quite correct to observe that FERC could just yank this out at any point. But for this pesky little L-4 thing, which appears to give someone, according to them, the vested right, which I've just tried to explain didn't really exist. It was conditional, and we had to first meet the L-1 thing. We've talked about the kids having their TV analogy. You can come up with many, many others. But because I'm worried that— The best argument is not retroactive. The best argument is not retroactive is because they got a year's worth of notice through the stakeholder process they actually participated in this was going. They had complaints filed before the 205 was filed. The 205 is about an auction that was taking place nine months later for a delivery year that was a further bid after that. So— Doesn't your argument just say that this amendment was not retroactive? Like, this is— Yes. It wasn't a normal process. Yes, the change is— They didn't notice that it was going to happen. Yes. Their argument is that they have a right that vested back when they cleared.  And that right said—and I want to get that correct because it didn't say entitled, because I had remembered. The 2004 order says that PJM's proposal would allow an EE resource to bid into the auction, and if it is accepted, to bid for an additional three consecutive years. As a result, the resource may receive capacity payments for up to four consecutive years. They were trying, Your Honor, to quell fears that there was not going to be some mechanism for these guys to achieve their recovery. By the time they were built in in 2016, it was there. So L4 is, A, a relic. B, it does not mean what they said it means, and no one ever argued otherwise until very, very recently. And, like, Your Honor noticed that they're not the only EE provider. Where are the other ones? This is an overwhelmingly important— Where's everybody else? They're not here. There are still other people who provide EE at the state level. They don't get—the difference is this. They're not getting paid through the market. There's much here about their business model and how— But can we go back to retroactivity? I want to understand your best argument for why this is not retroactive, because it sounds to me that your arguments sound in—there's an amendment process. They had no— I'll make it by way of— Go back to the point where they cleared. I'll make it by way of sort of like a summary judgment argument. Let's assume that their interpretation of L4 were accurate. We do not agree that that is true for the reasons I brought up, may, et cetera, and the fact that their whole theory of why may means shall is just utterly wrong, even in the text of the order. But let's—so let's accept that, for argument purposes, that L4 should be read as they read it. It still could have been eliminated with forward effect. They are a very, very small portion of things that changed in response to the most big recent event, which is the very, very large capacity auction prices that went up by 10 times this last year. Can we just— You're confusing. I'm not trying. Okay. I know you're not trying to confuse me, but, like, can we just stick with this and not go into other situations? Yeah. This was part and parcel of several other changes that occurred. I'm trying to link this together with the lockdown argument, because I think that you may believe that FERC was overselling the idea that granting this complaint would cause very serious damage for rate making, and we would like to very much get behind the argument that it would. Let's assume L4 means what they say it means. We could have still, with 60 days' notice, removed that, no matter whether or not they were already making business decisions on that subject. This happens, unfortunately, very frequently, and the reason why I was mentioning the large auction is because this is a baby change compared to the other massive changes that were made in the new auction that was just held. For example, everyone who provides DER, everyone who is now subject to and everyone who was previously relieved of any of that. It's not a question you can change big things. Okay. The question is if you tell somebody that when you clear, you can offer an option for an additional three consecutive delivery years. To me, that's a very specific term that doesn't apply to all these other things that you're talking about. Right. And what makes it specific, Your Honor? Why is it that this didn't vest when they cleared? I'm trying to say that the only thing that makes that interesting is because they mention a specific number of years. That's what makes it very specific. I'm trying to tell you that the context for that three-year forward look is because at the time that was written in 2009, there was not a clear way for them to get paid that money. They were going to allow them to get that, but that didn't change in 2016. Then you have the legitimate question, once things changed in 2016, why did you not go reverse and take this relic out? Well, that didn't happen. It was still there. What I'm trying to say is that there are other affirmative provisions that only differ in that they don't talk about a specific number of years, but that say affirmative open-ended things like if you are a demand response resource, if you are a hybrid resource, if you are a solar or wind resource, you do not have to pay non-performance charges. There's no limit on it. There's no specifics, and that got yanked away. And orders that were issued contemporaneously with these and part of a larger package of things that happened. It is absolutely unclear to me how mentioning that something can happen for three times is not different because you don't have to pay performance charges. You can change that so that you do have to pay performance charges. But if you say you don't have to pay performance charges for three years if you clear on this particular date, I think that's the thing. Like they cleared on a particular date, so I don't know why they didn't vest for those three years as of that particular date, as opposed to a general rule change, which, of course, you can do. The rule used to be what you just said, and now we've changed that. You can do that. Of course you can. But if there's a provision that says on a particular date you get a right, because once you clear an option, you can be offered for an additional three consecutive delivery years. To me, isn't that the distinguishing factor that you cleared an option? It was a date on which you got a right to participate for three more years. That's vested. I think an example, if you really wanted to vest the right and lock it in, you would have taken advantage of the inventory price adjustment. You would have said, I'm taking this money, I'm taking this offer, and I'm going to extend it for the next three years. That's an option right there at the bottom of L4. If you want to guarantee you're going to clear and you want to guarantee your price, it's right there. So there were ways that they could have locked it in. I'm not trying to pretend that L4 is a model of clarity. These things are drafted by stakeholder committees, and they write strange things in them sometimes. But I don't think that bending L4 to achieve an outcome here, which is utterly contrary to what we're trying to accomplish. Instead of to bend L4, I'm just trying to read L4. And L4 seems to say that if you clear an option, you can offer it to three consecutive delivery years. And I don't see it having that broad effect that you and Mr. Fish think, because I think it's a really specific thing that says, as of the date you clear the option, that's when you vest. Okay. I don't think that changes anything, because if there is an absolutely open-ended requirement that is not tied to a particular time, it says you may do this in perpetuity. You're a coal plant. You may offer it in perpetuity. That gets stripped away. There are so many different things I could point to. The rule is you can do this, and it is taken away. It is a protection that's given. It's defended. It's litigated here, and it's nevertheless still taken away. You can have a right of first refusal. It is built into your operating agreement. And then can issue an order in 2001. What you're saying, I'm just not seeing why this is different. I guess my question to you, then, Your Honors, I don't understand why. It seems to me lesser to say you have this right in perpetuity, and it's taken away, versus if this thing happens you get to do this other thing. But, again, I think it's all really explained by history. There's only one reason for L4 to exist, and to read the entire context of the order and what was happening at the time. They wanted to make sure that these guys had some opportunity to recover their money, and they weren't really sure how anyone was going to measure any of these things. And this was an opportunity for them to say, hey, you don't get your money this time. You get these other bites of the apple. It also gets down to the whole business model here. Realize how unusual this is. If you're saying somebody's cleared an auction, and now they're going to get to re-clear the same materials going into a future year, you cannot do that if you're a firm. Well, that's what L4 says. No, but I'm explaining why it could only make sense in the context if you even contemplate somebody participating in a later auction, because they would have to show the very thing that they're arguing with us about today, which is that somehow they weren't paid enough in that earlier auction to account for what they did before, which gets to a whole question about their business model. And, of course, their business model is very much under consideration by FERC enforcement, and a totally different proceeding from here. So I'm sure that they would like to get one last bite. There were some other strange things that were said here today that I'm still trying to figure out. I'm not expecting to come up and concede outright that the only thing that they were trying to do was get money from this upcoming auction, and that their own reading of L4, if L4 were restored, it meant what it said. If they were allowed to clear the upcoming auction, which they said they were certainly going to be able to do because you're going to be those price takers, I don't see what the limiting principle can be. They're just offering that up as like a self-imposed limitation, because if L4 means what they say it means, then if you order them to be allowed to clear for this auction, I do not see how the same reading that caused you to allow them to have relief wouldn't also mean they could argue for the next auction. We need to change the tariff to say starting this auction. We already did. Right. We already did. Right. So it's not clear to me how much further we would need to go in eliminating that. And I think they would have maybe possibly another year after that. But the positions they've raised today are, again, they're things I did not expect them to say in particular. They've always been in favor of eliminating the ad back mechanism, which is the only way they could have been paid. But that was... Can these cases be settled? I don't know. Is this a context in which, like, I don't know, PGM and... I think that's a question of conscience. PGM can, of course, try to settle with someone, but who's going to pay the bill? PGM is the significant issue. Our rates go up. Exactly. There is no way for us to settle with them without giving your money to them. And that's one of the reasons why the winners from Elliott focused such great attention on, oh, my gosh, how much are we paying these guys? This is a lot of money. And so who's going to be the bad guy who's going to have to go tell FERC that their lovely experiment that they started is not really working out and needs to be gotten rid of? And that's the real reason why no one sought to get rid of it earlier. But please do understand that if they're serious that the ad backing mechanism is something they've always opposed, there's still a pending complaint from the NIM and FERC right now that says, all right, this is always illegal. Nobody gets any money from 2016 forward. And that's still there.  All right. Yeah, the whole other level of retroactivity is involved there. I would very much like to talk about why this is a just and reasonable thing for it to do and also why it is that they didn't really have any reasonable reliance interest. I'm not clear if you're tolerant for me to go into those spaces, but I would like to discuss that. Do you have any other questions? I think that we're clear on those points. Thank you. All right. Well, if there are no further questions, I really do appreciate your time. Thank you very much. In answer to Your Honor's question, I direct the court's attention to page 20 of our reply brief on the contention that, in fact, except to the extent that our EERs or the EERs of any state utility or other EER provider are already included in the forecast, they both lower prices and they increase reliability. As to the points about retroactivity, which obviously consumed almost all of the bottom side argument at the court's direction, I have five points to make, maybe four. Number one, this notion about the L4 can only be interpreted in light of L1, and therefore, yes, if you clear in the first year, you've got to write in the next three years, but only if those light bulbs and compressors and everything that you bid in, which will also be operating in the next four years, in the next three years, are not already reflected in the peak load forecast. That understanding is a genuine novelty in the briefing in this case. In FERC's 2009 order, Your Honor quoted the language. It clearly understood that the time you needed to convince PJM that you really were a measurable, verifiable EER was in year one. Their reading of it would make that three additional year guarantee self-defeating because if we come to them in year one and say we're going to bid in a savings of 100 megawatt hours at peak load based on these 100,000 light bulbs and God knows how many air conditioners, et cetera, et cetera, they know that in year two, year three, and year four, those same products are going to be reducing demand. It's self-evident that they have the ability to build that information in, whether this is before 2016 or after 2016. The time to establish eligibility was in year one, and that's the only sensible reading and the only reading that anybody had of this until the bottom side briefs were filed in this case. Number two, this reliance on national cable and mobile relay, and also, I guess, to some extent on this year of decision in celltronics. In national cable, none of those cases were careful to explain that none of them involved a vested right. In national cable, Judge Pan, as your Honor recognized, what the holding was, number one, the FCC had never approved these contracts. There was no government imprimatur placed on them. The complaints came. They had an investigation about whether they were illegal, and they found that the cable companies had no legal right under the contracts because they violated the antitrust law. It's like saying if somebody comes and complains to you about an antitrust conspiracy and shows the following agreements, you're not limited in giving relief to saying, well, we can't touch those existing agreements because they were made, et cetera, et cetera, even though they were illegal. We can only say that in the future when you make agreements, you can't include this particular provision. In mobile relay, this court specifically held that the plaintiff had only a, quote, mere expectation, not a right of any sort to switch uses within the band that it licensed because the FCC always, quote, retains unilateral authority to modify a license, and therefore the court held the plaintiff had merely the expectation that the license could be used for a number of options, including ESMR. And finally, in Celtronics, again, this involved a new rule that attempted to extend the grace period for making certain payments. The court said that there was no vested right ever involved to do this, and that's the distinction in those cases. Okay. Yeah, yeah, okay. They say, well, you know, we fail, our reading fails on retroactivity, reading fails under the Landgraf test. Landgraf, again, says that whether the new provision attaches new legal consequences to events completed before its enactment. Now, in their briefing, they refer repeatedly to a formulation that Justice Scalia's own concurrence in, I'm forgetting the name of the case, but it's cited repeatedly in the briefs. What Justice Scalia said was retroactive rules alter the past legal consequences of past actions, and this court has repeated that formulation together with the Landgraf formulation. The past actions here are our investment, bid, and acceptance, and the past legal consequences were that under the existing tariff, we had the right to bid those same resources in three more years. Now, counsel for the FERC says, well, the whole reason we got that in the first place was there was this three-year lag between the auction and the delivery year. That was not the principle or even the second reason that is reflected in the 2009 order. The first reason was that these devices, this equipment, would have a useful life and keep reducing demand in the out years, and therefore, we should include the right to continue to account for them in at least some years. There was an argument that three additional years wasn't enough, and what FERC ordered was that PJM investigate whether the four-year right was long enough. The second reason was, as counsel for PJM acknowledged, to give bidders the certainty and stability that they would have more than one year to recover their costs. And what the court said is, in addition, there is this three-year lag period. I guess I can do only four points. The point, the hypothetical about in perpetuity, well, you know, the reasoning here would necessarily say that if a tariff said you could continue to bid these cleared resources in perpetuity, you have to agree with that. Well, first of all, as Your Honor pointed out, that is not this case. Second of all, because FERC has to issue, has to approve rates only if they are just and reasonable, it would not be just and reasonable essentially to prevent the tariff from ever being changed, no matter what the change circumstances were. And second of all, if there were such a provision, it's, you know, the argument would certainly be that's not enforceable because it is inconsistent with the statutory mandate. It can't mean forever. Here, it was expressly tied both to the estimated useful life of the demand-reducing products and the reasonable return. As to Mr. Shepard's arguments, just three very quick points. Number one, you know, the argument, and Your Honor mentioned it, well, you know, you're going to be out of this market, but, you know, FERC says there are state utilities and they'll still be able to operate. Those utilities are also bidding on the supply side, and they are also now cut off. They are not receiving payments from PJM for the EERs that they used to bid in and now are not allowed to bid in. Number two, this argument that the independent monitor for years has been saying that this ADVAC is crazy and we have to get rid of it, we have to get rid of it, and they proclaim that, look, this change was the result of a vote of the stakeholders of PJM that we had to get rid of EERs and the ADVAC, the proposal from PJM at that stakeholder meeting was to retain them because it was important to retain EERs on the supply side. Thank you. Thank you so much.  Thank you so much.  This is a minute. Thank you very much. Thank you very much.
judges: Henderson; Pan; Ginsburg